1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

ADVANCED TARGETING
SYSTEMS, INC.,

11

Plaintiff,

12

v.

13

14

ADVANCED PAIN REMEDIES,
INC., CATO RESEARCH, LTD., and
DOES 1-50, inclusive,

15

16

Defendants.

CASE NO. 12-cv-02915 JM (WMC)

ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS

[Dkt. Nos. 35 and 36]

17
18

Plaintiff Advanced Targeting Systems, Inc. ("Plaintiff") initially filed a

19

complaint against Defendants Advanced Pain Remedies, Inc. ("APR"), and Cato

20

Research Ltd. ("Cato Research") (together, "Defendants") in San Diego Superior

21

Court.  On December 7, 2012, Defendants removed the action to this court.  On

22

February 22, 2013, APR filed a Federal Rule of Civil Procedure ("Rule") 12(b)(2)

23

motion to dismiss due to the court's lack of personal jurisdiction over APR, and

24

Cato Research filed a Rule 12(b)(7) motion to dismiss the action for failure to join a

25

party under Rule 19.  On June 3, 2013, the court denied Defendants' motions

26

without prejudice and subject to renewal following additional discovery.  On

27

October 7, 2013, Defendants filed renewed motions to dismiss on the same grounds

28

as their previous motions.  The court heard oral argument on Defendants' motions

on December 16, 2013, and took the matters under submission.  For the reasons set forth below, Defendants' motions to dismiss are denied.

**BACKGROUND**

Plaintiff is a Delaware corporation headquartered in San Diego, California that develops and markets targeting reagents  for scientific research, including a pain-killing conjugate known as Substance P Sporin ("SP-SAP").  From 2007 to 2008, Plaintiff negotiated the terms of a Development and License Agreement ("DLA") with Cato Holding Company's Cato BioVentures Division ("CBV").[1] Cato Holding Company provides worldwide regulatory consulting and clinical research services to clients seeking regulatory approval for the sale of drugs and the development of drugs for later licensing sales through its subsidiaries.

During negotiation of the DLA, Plaintiff contends it met with CBV representatives no fewer than six times during negotiations of the DLA.  Plaintiff further alleges that all in-person meetings occurred in San Diego.  Specifically, Plaintiff alleges there were meetings at Plaintiff's offices with Shawn Singh in May 2007 and a meeting with Dr. Cato and Lynda Sutton in August 2007 as well as meetings with Dr. Cato and Lynda Sutton at Cato Research's San Diego office in November 2007.  The parties disagree about the nature of these meetings.  Plaintiff alleges CBV visited Plaintiff in San Diego for due diligence purposes.  In contrast, Defendants contend Dr. Cato and Ms. Sutton were in San Diego on an unrelated business trip for Cato Research and not to negotiate the DLA.  Defendants allege all of the negotiations for the DLA were handled from Durham, North Carolina.

In November 2007, Douglas Lappi, Plaintiff's president and CEO, and Dr. Cato, President of Cato Research, signed a term sheet setting forth the terms of the license agreement for SP-SAP in further detail.  In the term sheet, Plaintiff agreed

---

[1] While not entirely clear from the briefing, CBV does not appear to be a separate entity from Cato Holding Company.   Plaintiff contends CBV is a d/b/a of Cato Holding Company, the parent company of Defendants Cato Research and APR., and APR has not contested this allegation.

that a "NewCo," headed by Dr. Cato and Lynda Sutton, would be offered the option to exclusively license SP-SAP.  The term sheet also stated that Cato Research would "begin immediate work toward a pre-IND meeting with the FDA. . . . Cato Research, NewCo and [Plaintiff] ATS [would] attempt to move the project as far forward as possible in order to maximize the value of the company before investment funds are sought.  [Plaintiff] ATS will pursue further grant and contract funding as may be available for this purpose."  Plaintiff alleges this document was signed following the November 2007 meeting at Cato Research's office in San Diego, but it is unclear whether Dr. Cato signed this document in California or North Carolina.

Once the final terms had been agreed upon, it was decided that Research Triangle Pharmaceuticals LLC ("Research Triangle") would be the "NewCo" for the agreement.  Defendants allege both parties agreed on the use of Research Triangle, but Plaintiff alleges Defendants substituted APR for "NewCo" after the terms were finalized.  Research Triangle was in existence during the negotiation of the DLA but did not participate in the negotiation process in any way.  In her deposition, Lynda Sutton states that CBV negotiated with Plaintiff instead of Research Triangle because ordinarily CBV does not establish a portfolio company until the parties are at an agreement stage.  Smith Decl. Ex. F, Dkt. No. 41-20.

Research Triangle and Plaintiff entered into the DLA with Dr. Lappi signing for Plaintiff in San Diego and Dr. Cato signing as President of Research Triangle in Durham.  At some point thereafter, Cato Holding decided to change the name of Research Triangle to APR in order to more accurately reflect the nature of SP-SAP. Pursuant to Section 3.2 of the DLA, APR separately contracted with Cato Research to serve as the clinical research organization providing services which were APR's responsibility under the DLA.  Cato Research was another of Cato Holding Company's subsidiaries with Dr. Cato serving as President.  Pursuant to the contract with APR, Cato Research undertook all of the clinical research and regulatory work

1  required under the DLA and performed most of that work from North Carolina.

2      Here, the parties' stories diverge.  Plaintiff claims that it instructed APR not

3  to take any action that would hinder progress on the FDA's approval of SP-SAP,

4  such as filing a deficient IND application, and assured APR that it intended on

5  continuing their partnership, even if the license expired.  Nevertheless, APR filed an

6  IND Application in order to avoid expiration of the license.  Plaintiff considers this

7  filing to have been a "Sham IND Application" because of its apparent deficiencies.

8  After filing, Plaintiff alleges APR requested that the FDA take no action on the IND

9  Application.  Plaintiff claims that the filing of this allegedly deficient IND

10  Application violated the DLA's terms.  Plaintiff further claims that Cato Holding

11  and its affiliates falsely told it that the FDA response to the IND Application was

12  quite positive and thereby violated the common law prohibition on false

13  concealment.

14      Defendants deny Plaintiff's allegations regarding the filing of the IND

15  Application.  After the IND Application was filed, APR claims that the FDA called

16  Lynda Sutton, President of Cato Holding, to discuss issues related to the IND

17  Application that could have led to it being placed on hold.  Specifically, APR claims

18  that the FDA was concerned about the clinical trial materials that were allegedly in

19  Plaintiff's control.  In order to avoid the difficulty and stigma of removing an FDA-

20  imposed hold on the IND Application, Cato Research, acting on behalf of APR,

21  arranged to have the IND Application placed on inactive status.  APR alleges that

22  the FDA later sent a letter detailing the issues that needed to be resolved for the

23  IND Application to be acceptable, half of which could easily be resolved by Cato

24  Research and half of which Plaintiff needed to resolve.

25      In mid-2011, the parties initiated a contractual dispute resolution process to

26  begin with a mutually agreed upon meeting at the San Diego Marina Marriot in San

27  Diego, California.  However, APR canceled the meeting with little notice, so a

28  videoconference was held instead.  After a short presentation by Plaintiff, APR

1    terminated the videoconference.  In November 2011, the parties attended an

2    unsuccessful mediation at the JAMS office in San Diego in accordance with the

3    terms of the DLA.

4          After mediation failed, Plaintiff filed a complaint against Defendants in

5    California State court on October 29, 2012.  Pursuant to California Code of Civil

6    Procedure § 415.40, APR was served by registered mail on November 8, 2012.

7    That same day, APR filed an "Application and Order Extending Time to File

8    Complaint." APR later filed a complaint regarding the same dispute over the DLA

9    at issue here in North Carolina on November 28, 2012.

10    **APR's Motion to Dismiss for Lack of Personal Jurisdiction**

11    **A.  Legal Standard**

12          Plaintiff, as the party seeking to invoke jurisdiction, bears the burden of

13    establishing that personal jurisdiction can be exercised over Defendants.  See Flynt

14    Distributing Co. v. Harvey, 734 F.2d 1389, 1392 (9th Cir. 1984).  Plaintiff cannot

15    rely solely on allegations in the complaint that have been appropriately challenged

16    by affidavit.  See Taylor v. Portland Paramount Corp., 383 F.2d 634, 639 (9th Cir.

17    1967).  If this court acts on the motion to dismiss without holding an evidentiary

18    hearing, however, Plaintiff is only required to make a prima facie showing of

19    jurisdiction rather than a showing by a preponderance of the evidence.  See Doe v.

20    Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001) ("That is, the plaintiff need only

21    demonstrate facts that if true would support jurisdiction over the defendant.").  If

22    unchallenged, Plaintiff's version of the facts is taken as correct.  See id.  If there is a

23    factual conflict in the affidavits, the court must resolve that conflict in Plaintiff's

24    favor.  See id.

25          Determining whether a basis for the exercise of personal jurisdiction in a

26    diversity of citizenship case exists depends on: (1) whether a state statute of the

27    forum confers personal jurisdiction over the nonresident defendant, and (2) whether

28    the exercise of jurisdiction accords with federal constitutional principles of due

process.  See Data Disc, Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1286 (9th Cir. 1977).  California's long-arm statute authorizes personal jurisdiction to the extent allowed under the constitution.  See id.; Cal. Code Civ. Pro. § 410.10.  Under the constitution, personal jurisdiction can take the form of either general or specific jurisdiction.  See id.

General jurisdiction is established if a party's activities in the state are "substantial" or "continuous and systematic" regardless of whether those activities are related to the claim at issue.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984); Data Disc., 557 F.2d at 1287.  However, a defendant may still be subject to specific jurisdiction if it has purposefully availed itself of the forum state and the controversy is related to or arises out of those contacts.  See Burger King v. Rudzewicz, 471 U.S. 462, 472-73 (1985).  A court may only exercise specific jurisdiction over a defendant if doing so would comport with notions of fair play and substantial justice.  See id. at 477.  When analyzing whether a party's contacts with the forum support the exercise of specific jurisdiction, the court will consider whether:  (1) the nonresident defendant engaged in some act or consummated some transaction with the forum or performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; (3) the exercise of jurisdiction must be reasonable.  See Flynt Distributing Co., 734 F.2d at 1393; Data Disc, 557 F.2d at 1287.

"This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person."  Rudzewicz, 471 U.S. at 475 (citations and internal quotations omitted).  The rubric for determining whether a defendant purposefully availed himself of conducting activities in the forum differs if the action lies in contract rather than tort.  The

existence of a contract with a resident of the forum state is insufficient by itself to create personal jurisdiction over the nonresident.  See Rudzewicz, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); see also Gray & Co. v. Firstenberg Machinery Co., 913 F.2d 758, 761 (9th Cir. 1990).

"The existence of a relationship between a parent company and its subsidiaries is [also] not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum." Doe v. Unocal, 248 F.3d 915, 925 (9th Cir. 2001) (citing Transure, Inc. v. Marsh and McLennan, Inc., 766 F.2d 1297, 1299 (9th Cir. 1985)). "[A] parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.'" Unocal, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 51, 69 (1998)). "Appropriate parental involvement includes: 'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures.'" Id. "Nonetheless, if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation.  An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations." Id. at 926 (quotation omitted); see also Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir. 1996) ("A parent corporation's relationship with its subsidiary may confer personal jurisdiction over the parent if the subsidiary is acting as the parent company's alter ego, so as to justify disregard of the corporate entity.").

**B. Discussion**

In its order addressing APR's previous motion to dismiss for lack of personal jurisdiction, the court concluded Plaintiff had "not yet demonstrated that APR had

continuing obligations that tied APR to San Diego" as required for finding specific personal jurisdiction.  See Dkt. No. 23 at 10.  However, the court further noted that Plaintiff had "made a colorable showing that the court can exercise personal jurisdiction over APR because Cato Holding and APR's ties to one another appear to go beyond that of a normal parent-subsidiary relationship."  Id.  In making this observation, the court questioned Cato Holding's negotiation of the DLA on behalf of APR's predecessor-in-interest, particularly because it is debatable "whether negotiating contracts is something an investor would typically do on behalf of a company."  Id.  Moreover, it was unclear from the briefing whether APR even existed when the DLA was being negotiated and whether APR's obligations under the DLA required it to maintain anything other than a standard contractual relationship with Plaintiff.  Id.  In the briefing on APR's renewed motion to dismiss, the parties have provided the court with additional evidence pertaining to these issues.  Nonetheless, APR maintains that its contacts with California are insufficient to establish personal jurisdiction, whereas Plaintiff contends personal jurisdiction exists based upon both APR's contacts with California and Cato Research's contacts made on APR's behalf.

Specifically, APR emphasizes that it had no pre-contract contacts with California because it was not involved in the negotiation of the DLA.  For this reason, APR argues none of the contacts referenced by Plaintiff that occurred before the signing of the DLA may be attributed to APR.  As discussed in further detail below, APR also contends that any contacts made by CBV or Cato Research prior to the signing of the DLA may not be attributed to APR as they are separate entities that are not subject to alter ego liability.

As an initial matter, APR argues its agreement to a California choice-of-law provision and to mediate in California under the DLA are insufficient to establish minimum contacts.  Consent to a forum's laws is not consent to jurisdiction by that forum's courts.  See Gundle Lining Const. Corp. v. Adams County Asphalt, Inc., 85

F.3d 201, 206 (5th. Cir. 1996).  Additionally, APR contends the parties' mediation that occurred in California is irrelevant to the issue of personal jurisdiction because the dispute matured well before the mediation occurred and therefore the dispute did not "arise out of" the California contact, therefore disqualifying it as a contact for purposes of finding personal jurisdiction.  Moreover, APR suggests its refusal to consent to a California exclusive jurisdiction clause within the terms of the DLA indicates the very opposite of "purposeful availment" when it comes to California courts.

With regard to <u>past</u> performance under the DLA, APR alleges it made only two overt acts or "contacts": (1) retaining and contracting with Cato Research, another North Carolina entity, as called for by the DLA; and (2) attending a pre-IND meeting with the FDA.  APR retained and worked with Cato Research in and from North Carolina, not California, and the pre-IND meeting took place at FDA headquarters in Maryland.  Additionally, the objectionable activities referenced in Plaintiff's complaint, the filing of the "sham" IND application, were performed by Cato Research.  Cato Research prepared the IND on the East Coast and submitted it to the FDA in Maryland.  With regard to <u>future</u> performance under the DLA, APR asserts that while it is responsible for sponsoring the New Drug Application for SP-PAP, this process would also be made from APR's office in North Carolina and would be submitted to the FDA in Maryland.

For the above reasons, APR argues its contacts with California are simply insufficient to establish personal jurisdiction.  As previously noted, APR further argues Plaintiff is unable to impute contacts by other, separately formed entities to APR in order to warrant the exercise of personal jurisdiction.  APR contends Plaintiff will be unable to show anything more than a traditional, sister-company relationship with Cato Research, and nothing more than a normal parent/subsidiary relationship with CBV.  In order to find an "alter-ego" relationship, Plaintiff must show "(1) that there is such unity of interest and ownership that the separate

personalities of the two entities no longer exist, and (2) that failure to disregard their separate entities would result in fraud or injustice." Doe, I, 248 F.3d at 926. Despite the fact that these entities shared officers and directors, "directors and officers holding positions with [related entities] can and do change hats to represent the two corporations separately." See United States v. Bestfoods, 524 U.S. 51, 69 (1998). Additionally, two companies forming a third company, like APR, to jointly develop a new drug is commonplace in the pharmaceutical industry, and both parties agreed to this structure within the term sheet and DLA. APR emphasizes that Plaintiff knew Cato Holding Company was negotiating on behalf of NewCo/APR, and that the relationship among Cato Research, APR, and Plaintiff was established in the term sheet and DLA, both of which were signed by Plaintiff. Accordingly, APR argues Plaintiff cannot show the required fraud that is necessary to prove the drastic remedy of "alter-ego" liability.

Finally, APR emphasizes that the primary activities under the DLA were completed by Cato Research, not APR. APR notes Plaintiff executed a separate agreement with Cato Research that APR contends Cato Research was specifically inserted into the DLA by Plaintiff to be the entity actually conducting the work, suggesting Plaintiff knew it was mainly dealing with and relying upon Cato Research. APR's most significant contacts under the DLA are with Cato Research, who performed all of the DLA's obligations other than the possible future payment of royalties. APR notes Plaintiff and Cato Research entered into a separate agreement in 2010 for Cato Research to assist Plaintiff in developing and marketing products. For these reasons, APR contends Plaintiff has not established alter ego as required to impute the contacts of CBV and Cato Research to APR.

In response, Plaintiff contends APR voluntarily assumed contractual obligations that created a continuing relationship with Plaintiff, its "partner" in working toward the ultimate goal of developing SP-SAP as a drug approved for use in humans. Plaintiff contends APR should have reasonably anticipated being haled

1  into California court for litigation arising out of the DLA, a long-term contract that

2  it voluntarily entered into with a California-based company and agreed would be

3  governed by California law.  When the circumstances are viewed as a whole,

4  Plaintiff argues personal jurisdiction exists.

5        First, Plaintiff contends its contract claims against APR arise directly out of

6  the DLA.  The DLA defined the "scope of the collaboration" between the parties to

7  develop and market a drug candidate based on SP-SAP.  DLA § 2.1.  Plaintiff

8  "irrevocably" appointed APR as Plaintiff's agent and attorney-in-fact to further the

9  purposes of the DLA.  Id. Ex. A.  APR received an exclusive, worldwide (and

10  terminable) license for SP-SAP and Plaintiff's patents.  Id. § 3.1. The

11  parties were to confer and seek to agree upon a strategy for expanding patent

12  protection, and APR was to receive "full rights of consultation" with ATS' patent

13  attorney.  Id. § 4.2.  Plaintiff contends the DLA contemplates a relationship beyond

14  SP-SAP, as APR received "a right of first refusal on any potential human

15  pharmaceuticals identified, developed or obtained by [Plaintiff] ATS during the

16  term of the License Agreement."  Id. § 3.5.  Additionally, Plaintiff turned over to

17  APR responsibility for preparing and prosecuting "any regulatory filings" required

18  for clinical trials of SP-SAP and responsibility for preparing and prosecuting

19  marketing approvals.  Id. Ex. A.  In exchange, Plaintiff received a 5% equity stake

20  in APR and royalty payments.  Id.

21        Plaintiff further contends that Defendants' own statements in announcing the

22  DLA demonstrate that they viewed it as creating a continuing relationship between

23  California-based Plaintiff and APR: "When we partner early, as we have done here,

24  we can make a major difference in the overall development of promising drug

25  candidates such as SP-SAP. … The flexible, broad-based relationships among

26  [APR], [Plaintiff] and Cato Research position us well to execute our innovative

27  drug development model."  Higgins Decl. Ex. F, Dkt. No. 41-6.  APR itself was

28  identified as "a new strategic development company formed by Cato Research,

1    [Plaintiff] and Cato BioVentures." Id.

2         Additionally, Plaintiff argues APR incorrectly takes an isolated and myopic

3    view of minimum contacts when the totality of the circumstances indicates APR

4    purposefully established minimum contacts within California.  The provisions of the

5    DLA suggests the parties contemplated a broad-based relationship with each other

6    as partners.  Additionally, the terms of the DLA create contacts with California,

7    including the choice-of-law clause and mandatory mediation in California

8    Although a choice of law clause "standing alone would be insufficient to confer

9    jurisdiction," it is a factor that reinforces APR's "deliberate affiliation with the

10   forum state and the reasonable foreseeability of possible litigation there." See

11   Burger King, 471 U.S. at 482; Wessels, Arnold & Anderson v. Nat'l Med. Waste,

12   Inc., 65 F.3d 1427, 1434 (8th Cir. 1995) ("We find, however, that a choice-of-law

13   clause is an important factor in determining whether the defendant purposefully

14   availed itself in the forum state.").  Further, the DLA required that all notices and

15   other communications be sent by APR to Plaintiff's office in San Diego.  DLA §

16   9.5; see also Burger King, 471 U.S. at 480 (noting, as a fact supporting jurisdiction,

17   that the contract required all notices be sent to the franchisor's Miami headquarters).

18   Pursuant to the DLA, APR was responsible for fund-raising activities, and CBV

19   representatives met at least once with potential investors in San Francisco in doing

20   so.  Higgins Decl. Ex. L, Dkt. No. 41-12.  While refusing to provide Plaintiff with a

21   copy of the IND Application directly, APR and Cato Research made a copy

22   "available" to Plaintiff at their offices in San Diego.  Higgins Decl. Ex. K, M, Dkt.

23   Nos. 41-11 and 41-13, respectively.  Further, a California-based Cato employee, Dr.

24   Barbara Winston, submitted work order request forms on behalf of APR to Cato

25   Research for work to be performed by Cato Research under its subcontract with

26   APR.  Smith Decl. Ex. G, Dkt. No. 41-21.  In sum, Plaintiff argues the parties'

27   course of dealing reinforces a finding of personal jurisdiction based upon the APR's

28   substantial connection with California through the DLA.

Plaintiff contends CBV's contacts may be imputed to APR under agency and alter ego principles.  As noted in the court's previous order, an affiliated company's contacts may be imputed to another if the two "are not really separate entities, or one acts as the agent of another …."  Dkt. No. 23 at 8:1-2 (quoting Doe v. Unocal, 248 F.3d 915, 925 (9th Cir. 2001)).  A number of factors are considered when applying the alter ego doctrine, including: (1) identical equitable ownership in the two entities; (2) the use of the same offices and employees; (3) inadequate capitalization; and (4) the use of a corporation as a mere shell, instrumentality or conduit for the business of another corporation.  See In re Hydroxycut Mktg. & Sales Practices Litig., 810 F. Supp. 2d 1100, 1122 (S.D. Cal. 2011).  Although no single factor is determinative, inadequate capitalization may alone be sufficient.  See Slottow v. Am. Cas. Co. of Reading, Pa., 10 F.3d 1355, 1360 (9th Cir. 1993) (applying California law).[2]  Similarly, contacts may be imputed under an agency theory "if a subsidiary performs functions that the parent would otherwise have to perform."  Unocal, 248 F.3d at 928.

Having reviewed and considered the parties' contentions, the court concludes Plaintiff has made a prima facie showing that personal jurisdiction exists over APR in this action.  On the whole, it seems APR purposefully availed itself of the privilege of conducting business in California such that it could reasonably anticipate being haled into court here based upon its continuing contractual relationship with Plaintiff, a California corporation.  While it was unclear previously, Plaintiff has demonstrated that APR's obligations under the DLA require it to maintain more than a standard contractual relationship with Plaintiff.  Despite APR's characterization of the DLA as separating the parties and creating independent obligations for each side, the joint efforts of the parties to develop and commercialize SP-SAP indicate otherwise.  Admittedly, Section 9.1 in the DLA

---

[2] APR objects to Plaintiff's use of California law on this issue, arguing that the law of the company's state of incorporation controls alter ego issues rather than the choice-of-law provision in the DLA.

1   states Plaintiff and APR are "independent contractors and [] nothing in [the DLA] is
2   deemed to constitute a partnership, agency, distributorship…or joint venture
3   relationship between the Parties."  Nevertheless, there are repeated references to the
4   parties' "partnership" within the parties' joint press releases and APR's emails to
5   Plaintiff.  For instance, the parties worked together to draft joint press releases
6   specifically referring to their cooperation and partnership in getting SP-SAP
7   approved for human use by the FDA.  Additionally, APR helped Plaintiff apply for
8   grant funds, create PowerPoint presentations, and select potential investors.  During
9   this process, the parties appear to have deliberately coordinated their efforts.  In
10  fact, when the dispute initially arose, Dr. Cato objected to Plaintiff's indication that
11  it wanted to work with Cato Research, and "not that [it] wanted to partner with
12  [APR]."  Dr. Cato suggested Plaintiff's actions "certainly [did] not reflect the way
13  one partner treats another."  Higgins Decl. Ex. L, Dkt. No. 41-12.  As a proposed
14  method of resolving their dispute and noting the parties' "previous bad experiences
15  with partners who tried to take advantage of us," Dr. Cato suggested the parties
16  "work much more closely together" in the future by acting "as partners."  Id.  Dr.
17  Cato's language in this email as well as the ongoing collaboration of the parties do
18  not reflect an independent contractual relationship without continuing obligations
19  on the part of APR.  Rather, it seems APR had a much closer working relationship
20  with Plaintiff than APR would like to admit.

21          Similarly, the court is not persuaded by APR's argument that it had limited
22  obligations under the DLA because it delegated its obligations to Cato Research,
23  and therefore Cato Research actually took most of the required action under the
24  DLA.  As noted by Plaintiff, the DLA was an agreement between Plaintiff and APR.
25  If APR opted to delegate its obligations under the DLA, APR nonetheless remained
26  responsible for ensuring the work was performed "even if such work is performed
27  by an Affiliate, Sublicensee or Third Party Subcontractor in support of the
28  Development Program under this Agreement."  DLA § 2.4.  Moreover, as noted

above, APR remained involved in coordinating certain aspects of the development process with Plaintiff, despite having delegated many of its obligations to Cato Research.  Indeed, the record reveals the parties had significant interaction with each other through email and telephone calls to accomplish their goals despite their different locales.  See Burger King, 471 U.S. at 476 ("a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"); Heritage House Restaurants, Inc. v. Continental Funding Group, Inc., 906 F.2d 276, 283 (7th Cir. 1990) (observing defendant "created a relationship which is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction").

It is significant that APR voluntarily entered into the contract with Plaintiff knowing that it contained a California choice-of-law provision.  While APR correctly notes this type of provision does not control the question of personal jurisdiction, it does provide additional evidence that APR could have reasonably expected that California courts would resolve any disputes stemming from its relationship with Plaintiff.  Burger King, 471 U.S. at 481-82.  Moreover, the court is not persuaded by APR's argument that its refusal to consent to an exclusive California jurisdiction clause reveals its intent to avoid California courts.  Rather, this seems to be another indication that APR should have reasonably anticipated being haled into California courts as it was clearly Plaintiff's intention to bring any litigation in California as evidenced by the requested exclusive jurisdiction clause.

In addition to APR's contacts with California, Plaintiff has made a prima facie showing of an alter ego relationship between APR and CBV sufficient to establish personal jurisdiction at this stage in the litigation.[3]  In order to allege alter ego, Plaintiff must demonstrate: (1) that there is such unity of interest and

---

[3] The court notes this conclusion is preliminary and limited to the court's consideration of the personal jurisdition issue.

ownership that the separate personalities of the two entities no longer exist, and (2) that failure to disregard their separate identities would result in fraud or injustice. Doe, 248 F.3d at 926.  "An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations."  Id.  In its previous order, the court expressed concerns regarding "Cato Holding's negotiation of the DLA on behalf of APR's predecessor-in-interest,"  noting "it is questionable whether negotiating contracts is something an investor would typically do on behalf of a company."  Dkt.  No. 23 at 10.

        While it was initially unclear, Plaintiff has now established that APR's predecessor-in-interest, Research Triangle, did exist at the time of the DLA negotiations.  As a result, Research Triangle presumably could have performed the DLA negotiations on its own behalf rather than through CBV.  When asked why CBV negotiated the DLA rather than the portfolio company, Lynda Sutton, CBV's representative and later the head of APR, indicated this was because CBV does not establish a portfolio company until they are at an agreement stage.  However, this was obviously not the situation here as Research Triangle already existed.  Rather, it seems that Research Triangle was unable to negotiate the DLA because it had no employees, assets or office space as of November 2007, when the term sheet was executed identifying "NewCo" as the licensee.  Smith Decl. Ex. F at 51:8-13, 52:16-17, Dkt. No. 41-20; Smith Decl. Ex. H, Dkt. No. 41-22.  In one of Lynda Sutton's declarations in this litigation, she referred to APR as "merely one of our CBV subsidiary 'shell companies' at that time."  Doc. No. 5-2, Sutton Decl. ¶ 9 (Dec. 14, 2012).  At the time the DLA was negotiated, Research Triangle had a name, but "[t]hat's really all it had."  Smith Decl. Ex. F. at 52:6-14, Dkt. No. 41-20; see Doe, 248 F.3d at 927 ("Similarly, under California law, 'inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of the subsidiary.') (quoting Slottow v. Am. Cas. Co. of Reading, Penn., 10 F.3d 1355, 1360 (9th Cir.1993)).  In this scenario, CBV's

1   negotiation of the DLA on Research Triangle's behalf reflects the entities' unity of

2   ownership and interests when the parties began their contractual relationship,

3   suggesting the existence of an alter ego relationship.

4        With regard to the court's previously mentioned concerns regarding the

5   relationship between Cato Holding and APR, the evidence produced by the parties

6   reveals significant overlap in the efforts and interests of CBV, Cato Research, and

7   APR.  For instance, Dr. Cato and Lynda Sutton negotiated the DLA as

8   representatives of CBV on behalf of a future NewCo.  Pursuant to the terms of the

9   DLA which they negotiated as CBV representatives, Dr. Cato and Lynda Sutton

10  agreed to head NewCo.  During the negotiations, Dr. Cato emailed Plaintiff and

11  repeatedly referred to CBV being offered the option to license SP-SAP, but in

12  actuality NewCo was being offered the option to license SP-SAP.  Higgins Decl.

13  Ex. B, Dkt. No. 41-2.  However, Dr. Cato did not make this distinction, instead

14  stating that Plaintiff would be able to obtain a percentage of NewCo in the event

15  "CBV exercises the option."  Id.   In this email, Dr. Cato seems to treat NewCo as

16  an extension of CBV by discussing the terms as if CBV would be signing the DLA

17  and accepting all of its obligations.  Id.  In one of Dr. Cato's later emails, he notes

18  representatives of CBV were at a partnering meeting in San Francisco and met for

19  the third time with a potential investor in APR.  Higgins Decl. Ex. L, Dkt. No. 41-

20  12.  He urges Plaintiff to stop contesting the validity of the licensing agreement and

21  to "[a]ct as partners" going forward, but it's not entirely clear whether Dr. Cato

22  refers to Plaintiff acting as a partner with APR, Cato Research, CBV, or any

23  combination of the three.  Id.

24       Additionally, Dr. Cato's and Lynda Sutton's overlapping roles in CBV, Cato

25  Research, and APR suggest these three entities did not operate independently of

26  each other.  Dr. Cato signed the term sheet as President of Cato Research, and later

27  signed the DLA as President of Research Triangle.  Higgins Decl. Exs. C and D,

28  Dkt. Nos. 41-3 and 41-4, respectively.  Dr. Cato was quoted as the CEO of both

APR and CBV in the joint press release announcing Plaintiff's receipt of a significant grant award.  Higgins Decl. Ex. I, Dkt. No. 41-9.  In an email to Plaintiff discussing their dispute regarding the FDA filing, he wrote on behalf of APR's interests in the DLA as the licensee of SP-SAP; however, he used Cato Research Letterhead and then signed the email as Dr. Cato, CEO for Cato Holding Company.  Higgins Decl. Ex. L, Dkt. No. 41-12.  While "directors and officers holding positions with [related entities] can and do change hats to represent the two corporations separately," there seems to be substantial overlap in the leadership roles within these three companies and also in the nature of the companies' interests.  See Bestfoods, 524 U.S. at 69.

In response to Plaintiff's alter ego argument, APR contends Plaintiff "intentionally confuses APR, parent Cato BioVentures (a non-party), and co-Defendant Cato Research" in its briefing, despite knowing that the distinction is at issue.  However, Plaintiff's confusion is unsurprising given the nature of APR's interactions with these other entities.  Dr. Cato has represented all three of these entities at one time or another.  In just one email, he seemingly represents all three at once - writing on behalf of APR, signing as CEO for Cato Holding Company, and using Cato Research Letterhead.  Dr. Winston, Plaintiff's primary contact during negotiations for the DLA signed by APR, is both an analyst for CBV and a research scientist for Cato Research.  Lynda Sutton represented CBV during negotiations of the DLA, served as Chief Operating Officer of Cato Research, and also became CEO of APR.  While not entirely clear from the record, it seems Lynda Sutton and Dr. Cato have been the primary decisionmakers for CBV, Cato Research, and APR from the initial negotiation of the DLA until now.  On the whole, the facts  suggest the relationship between Cato Holding's CBV and APR is more than an ordinary investor relationship.

For all of these reasons, a preliminary finding of alter ego status is warranted in light of CBV's seemingly unnecessary negotiation of the DLA for Research

1   Triangle and the significant overlap in the activities and interests of CBV, Cato
2   Research, APR, and their officers.  CBV's control over the DLA negotiations and
3   its investment activities on behalf of APR are not ordinary parental control of a
4   subsidiary.  CBV opted to change Research Triangle's name and also engaged in
5   fund-raising activities on APR's behalf in San Francisco.  As set forth in the initial
6   press release announcing the parties' agreement, APR would "work with Cato
7   Research and [CBV] to develop and commercialize SP-SAP" for use in humans.
8   Their coordinated efforts to accomplish this mutual goal sufficiently demonstrates
9   "such unity of interest and ownership that the separate personalities of the [three]
10  entities no longer exist."

11        Additionally, Plaintiff raises a persuasive argument that APR is simply a shell
12  company for Cato Holding to fund SP-SAP individually and without intermingling
13  funds from its other ventures.  Cato Holding, through its CBV department,
14  negotiated for an asset, i.e. the option to license SP-SAP, and then dumped it into a
15  preexisting subsidiary.  Research Triangle had no other assets at the time, and Cato
16  Holding could exercise full control over its actions at that point.  In the DLA, APR
17  agreed to contract with Cato Research to fulfill the DLA's obligations and now
18  argues that it in essence had no obligations under the DLA other than potential
19  payment of future royalties to payment.  While APR makes this argument in order to
20  show a lack of contact with California, it could also be interpreted as further
21  indication that APR is simply a fiction that was never capable of performing the
22  obligations created by the DLA.  Rather, APR simply served to hold the asset, and
23  CBV arranged to have the actual obligations under the DLA passed to Cato
24  Research, another subsidiary of Cato Holding that is also run by Dr. Cato and Lynda
25  Sutton.  Seemingly, all of these arrangements were made by Dr. Cato and Lynda
26  Sutton while acting in the interest of all three companies at once.

27        Notably, one of the articles submitted by APR in an attempt to substantiate
28  the commonplace use of pharmaceutical portfolio companies actually supports the

conclusion that APR is merely a shell company for Cato Holding.  In this article, the CEO of Forma Therapeutics was interviewed regarding his "trailblazing approach to structured deals by offering assets through a new company, or 'newco.'"  Dkt. No. 35-3 at 35-37.  Notably, he describes a "newco" as a "completely virtual company" or "shell company that holds the asset."  While these statements are not definitive on the issue as APR may be structured differently, it does support Plaintiff's argument that APR is not a typical subsidiary capable of existing independently of its parent and sister entities.

Having made a preliminary finding of such unity of interest and ownership that the separate personalities of the two entities no longer exist, the court further finds that failure to disregard their separate identities would result in injustice to Plaintiff under the circumstances.  Doe, 248 F.3d at 926.  Plaintiff is a California corporation, the parties negotiated this agreement in California, the parties agreed to a California choice-of-law provision and a California mediation, and Plaintiff was invited to review the purportedly "sham" IND application at a San Diego office by both Lynda Sutton and Dr. Cato.  Presumably, this is the Cato Research office in San Diego, but it is not insignificant that Dr. Cato referred to the location as "our San Diego office" while writing to Plaintiff on APR letterhead as APR's CEO.  On the whole, there appears to be such a unity of interest and ownership in these three companies that it would be an injustice to allow APR to avoid personal jurisdiction here when CBV and Cato Research have both had more than enough contact with California to support a finding of personal jurisdiction.[4]

In sum, Plaintiff has made a prima facie showing of personal jurisdiction sufficient to maintain this action in this court.  Accordingly, APR's motion to dismiss for lack of personal jurisdiction is denied.

---

[4] APR argues that Plaintiff cannot show the required fraud necessary to impute contacts based upon the alter ego theory.  However, fraud is not required.  Injustice to Plaintiff may also be a legitimate basis for imputing alter ego contacts to find personal jurisdiction.

**Motion to Stay or Dismiss for Failure to Join an Indispensable Party**

A party may file a Rule 12(b)(7) motion to dismiss for failure to join a party under Rule 19, which governs whether a party is considered indispensable to a civil action. <u>See</u> Fed. R. Civ. P. 19; <u>Confederated Tribes of Chehalis Indian Reservation v. Lujan</u>, 928 F.2d 1496, 1498 (9th Cir. 1991).  The court must first determine whether a party is "necessary" to the adjudication of the case.  <u>See</u> <u>Confederated Tribes</u>, 928 F.2d at 1498.  If a party is necessary, the court must determine whether it is feasible to join that party.  <u>See id.</u>  Only if a necessary party cannot be joined does the court go on to inquire into whether that party is "indispensable."  <u>See id.</u>  If an indispensable party cannot be joined, the action must be dismissed.  <u>See id.</u>

Whether a party is necessary to the adjudication of the case is a fact-specific inquiry.  <u>Bakia v. County of Los Angeles</u>, 687 F.2d 299, 301 (9th Cir. 1982).  The Ninth Circuit has pointed to two significant issues: "First, the court must consider if complete relief is possible among those parties already in the action. Second, the court must consider whether the absent party has a legally protected interest in the outcome of the action." <u>Confederated Tribes</u>, 928 F.2d at 1498 (citing <u>Makah Indian Tribe v. Verity</u>, 910 F.2d 555, 558 (9th Cir. 1990)).  Rule 19(b) provides that the factors to be considered in determining if an action should be dismissed because an absent party is indispensable: "(1) prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum." Fed. R. Civ. P. 19; <u>Confederated Tribes</u>, 928 F.2d at 1498.

As noted in the court's previous order on Defendants' motions to dismiss, Cato Research's motion to dismiss for failure to join an indispensable party becomes moot if the court finds personal jurisdiction exists over APR.  Dkt. No. 23 at 12.  Insomuch as the court has found personal jurisdiction exists over APR, Cato Research's motion is denied accordingly.

## **CONCLUSION**

Based on the foregoing, the court denies APR's motion to dismiss for lack of personal jurisdiction and Cato Research's motion to dismiss for failure to join an indispensable party.  Dkt. Nos.  35 and 36, respectively.  Defendants are ordered to file an answer or otherwise respond to the complaint within 20 days of the filing of this order.

IT IS SO ORDERED.

DATED:  January 30, 2014

_____
Hon. Jeffrey T. Miller
United States District Judge