1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                   SOUTHERN DISTRICT OF CALIFORNIA
8

9   ADVANCED TARGETING SYSTEMS,          Case No.:  12-cv-2915-JM-JLB
    INC., a corporation,
10                                        **ORDER:**
                            Plaintiff,    **(1) GRANTING DEFENDANTS'**
11                                        **MOTION TO ENFORCE THE**
    v.                                    **PARTIES' SETTLEMENT**
12                                        **AGREEMENT AND STIPULATION**
    ADVANCED PAIN REMEDIES, INC., a       **FOR JUDGMENT; and**
13  corporation; CATO RESEARCH LTD, a     **(2) DIRECTING THE CLERK OF**
    corporation; and DOES 1-50, inclusive, **COURT TO ENTER JUDGMENT**
14                          Defendants.
15
16                                        **[ECF No. 88]**
17

18        Presently before the Court is a Motion to Enforce the Parties' Settlement Agreement
19   and Stipulation for Judgment filed by Defendants, ADVANCED PAIN REMEDIES, INC.
20   ("APR") and CATO RESEARCH LTD, against Plaintiff, Advanced Targeting Systems,
21   Inc. (ECF No. 88.)  Defendants seek a court order to enforce the Stipulated Judgment
22   Amount set forth in the Parties' Settlement Agreement.  (*See id.*)  For the following reasons,
23   Defendants' motion (ECF No. 88) is **GRANTED**.
24                         **I.       BACKGROUND**
25        In this diversity action, the underlying dispute arose from a 2008 contract between
26   biotechnology companies regarding the development of Substance P-Saporin ("SP-

1

SAP"), a pain-killing conjugate developed by Plaintiff ATS.[1]  (ECF No. 1-2 at 1, ¶1.)  Specifically, in January 2008, to "assist in its ultimate goal of obtaining FDA approval," Plaintiff entered into a Development and License Agreement ("DLA") with Defendant APR that imposed continuing obligations on both parties.  (ECF No. 1-2 at 6-7, ¶¶15, 17.)  Plaintiff "ATS was responsible for producing SP-SAP for use in clinical trials." (ECF No. 1-2 at 6, ¶17.)  APR would prepare and prosecute an investigational new drug application ("IND Application"), which is the regulatory filing necessary to obtain FDA approval of the sale and use of a new drug for humans, for SP-SAP.  (ECF No. 1-2 at 6-7, ¶¶15, 17; ECF Nos. 23 at 3; 88-1 at 2, 89 at 7.)

The DLA also granted APR an exclusive license to market and sell SP-SAP, which would terminate after three years if APR did not file the IND Application.  (ECF No. 1-2 at 1, 7, ¶¶1, 18; ECF No. 89-1, Declaration of Denise Higgins ("Higgins Decl.") at 2.)[2] Further, Plaintiff ATS "filed four patents which were subject to the license."  (ECF No. 63 at ¶44; *see also* ECF No. 1-2 at ¶11.)  APR and Cato alleged in their Counterclaim that:

> The DLA provides with respect to these patents that (a) Advanced Targeting shall confer with APR regarding plans to secure expanded patent protection for Product.  The Parties shall seek to agree on the patent strategy to be followed in expanding such protection; and (b) Advanced Targeting shall keep APR informed with regard to patent application and maintenance processes. Advanced Targeting shall deliver to APR copies of all patent

---

[1] Plaintiff alleged that "SP-SAP eliminates the spinal cord neurons that send chronic pain signals to the brain, while allowing ordinary pain sensitivity to function normally.  The ability to separate chronic pain transmission from ordinary pain transmission, and the removal of chronic pain transmission, created great excitement in the scientific community, and ATS received patent protection for SP-SAP and second generation reagents."  (ECF No. 1-2 at 5, ¶11.)  "ATS's ultimate goal is to have SP-SAP approved as a chronic pain treatment option for humans."  (ECF No. 1-2 at 5, ¶12.)

[2] As to this term of the DLA, Defendants APR and Cato Research pled that the license would expire "if APR did not by that date either file an IND with the FDA (or foreign equivalent) or seek approval from an Institutional Review Board for initiation of human testing, provided that the January 15, 2011 deadline would be extended if the IND filing or seeking of approval from the Institutional Review Board did not occur for reasons outside the reasonable control of APR."  (ECF No. 63 at 5, ¶19.)

2

1
2

> applications, amendments, related correspondence, and other related matters;
> and (c) Advanced Targeting would cooperate fully in the preparation, filing,
> prosecution and maintenance of any patent rights with respect to Product.

3

4

(ECF No. 63 at ¶45.)  APR and Cato alleged that ATS materially breached its obligations

5

with respect to the four patents.  (*Id.* at ¶46.)  Both sides alleged that the other side was

6

responsible for wasting irreplaceable, valuable time under the patent lifespan.  (ECF No.

7

1-2 at ¶58; ECF No. 63 at ¶31.)

8

Pursuant to the DLA, APR began to take the steps necessary to obtain FDA

9

approval for SP-SAP. (ECF No. 23 at 3.)  Cato Research Ltd. was retained and drafted a

10

successful $3 million National Institutes of Health ("NIH") grant application, which APR

11

and Cato Research Ltd. alleged was to fund required development under the DLA.[3]  (ECF

12

No. 63 at ¶¶3, 30.)

13

Both sides asserted their own claims or counter-claims against one another, with

14

each side asserting that the other side wronged it and failed to honor the DLA.  (ECF

15

Nos. 1-2, 23, 63.)[4]  For example, the parties disputed whether Defendant APR

16

intentionally prepared and filed an unacceptable "sham" IND Application with the FDA

17

so as to improperly extend the life of APR's exclusive license to market and sell SP-SAP

18

under the DLA.  (ECF Nos. 1-2 at 2, ¶2; ECF No. 63 at ¶¶20-23, 32-43.)  APR alleged

19

that Plaintiff ATS sabotaged APR's efforts to prepare the IND Application by making

20

representations that "were intended to deceive APR such that it would not have adequate

21

time to prepare and file an IND, the consequence of which would be termination of the

22

---

23

24

[3] APR represented that it was an affiliate of Cato Research Ltd. (ECF No. 63 at 5, ¶18) and a partially-owned subsidiary of Cato Holding Company (ECF No. 36-1 at 6).

25

[4] Plaintiff's claims included: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory relief; and (4) fraud.  Defendants' counterclaims included: (1) declaratory judgment by APR against ATS; (2) breach of written contract by APR against ATS; (3) unfair and deceptive trade practices by APR against ATS; (4) unjust enrichment by APR against ATS;

26

(5) fraudulent inducement by Cato and APR against ATS; (6) breach of oral contract by Cato and APR against ATS; and (7) unjust enrichment by Cato against ATS.

27

3

1   license."  (ECF No. 63 at ¶50.)  APR and Cato also claimed that ATS breached its duties
2   to properly use and put to work the $3 million in NIH grant funds.  (ECF No. 63 at ¶¶31,
3   85, 89.)

4        On June 18, 2014 the parties participated in full-day Early Neutral Evaluation
5   Conference ("ENE").[5]  (ECF No. 72.)  With the help of Magistrate Judge Jill L.
6   Burkhardt, the parties reached a settlement at that ENE and put the material terms of the
7   settlement on the record.  (*Id.*)  The parties memorialized their settlement in a written
8   settlement agreement, but requested and received the Court's assistance with certain
9   language concerning confidentiality and the definition of gross revenue subject to
10  revenue sharing.  (ECF Nos. 79, 80.)  Thereafter, on August 28, 2014, the parties signed
11  the settlement agreement (hereinafter, the "Settlement Agreement").  (ECF No. 88-1 at 3;
12  ECF No. 88-2 at 2 (L. Sutton Decl.).)

13       At the time the parties operated under the DLA, the parties shared the ultimate goal
14  of obtaining FDA approval (or otherwise realizing revenue from SP-SAP).  In the course
15  of settling this dispute, Plaintiff ATS negotiated to have the right to pursue that goal,
16  whereas Defendants agreed to release its rights to SP-SAP, but negotiated the right to
17  share in revenue from SP-SAP.  (*See* ECF No. 88-3.)

18       The Settlement Agreement required Plaintiff to pay Defendants a "one-time
19  payment of one million one-hundred and fifty thousand dollars ($1,150,000)" by June 18,
20  2015.  (ECF No. 88-3 at 7.)  The Settlement Agreement also provided for Plaintiff to
21  make Royalty payments to Defendants out of any revenue generated from the SP-SAP.
22  The Settlement Agreement specifically provided that if Plaintiff were to fail to make the
23  one-time payment of $1,150,000 by June 18, 2015, "Defendants shall be entitled to a
24  stipulated judgment against [Plaintiff] and in favor of Defendants in the amount of two

25

26
27  [5] Prior to the ENE, the parties also participated in private mediation before a JAMS mediator in San
    Diego.  (ECF No. 1-2 at ¶34.)

4

1  million dollars ($2,000,000)."  (*Id.*)  "[H]owever, if the Stipulated Judgment is obtained
2  and paid in full, seven-hundred thousand dollars ($700,000) of the Stipulated Judgment
3  shall be creditable against Royalty payment obligations."  (ECF No. 88-3 at 7.)  Under
4  the terms of the Settlement Agreement, securing a stipulated judgment in the amount of
5  two million dollars ($2,000,000) constitutes Defendants' sole remedy for breach of the
6  Settlement Agreement.  (*Id.*)

7      Defendants filed this instant motion with the Court on August 28, 2015, after
8  Plaintiff failed to pay the one-time payment by June 18, 2015.  (ECF Nos. 88, 88-1 at 4.)
9  Plaintiff filed an Opposition to Defendants' motion on September 15, 2015.  (ECF No.
10  89.)  Defendants filed their reply on September 22, 2015.  (ECF No. 90.)

11                    **II.   LEGAL STANDARD**

12      A federal court has jurisdiction to enforce a settlement agreement in a dismissed
13  case where, as here, the dismissal order states that the court has retained jurisdiction to
14  enforce the settlement agreement.  *Hagestad v. Tragesser*, 49 F.3d 1430, 1433 (9th Cir.
15  1995) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)); *see*
16  *also Wackeen v. Malis*, 97 Cal. App. 4th 429, 440 (2002).  In such cases, "a breach of the
17  [settlement] agreement would be a violation of the [dismissal] order, and ancillary
18  jurisdiction to enforce the agreement would therefore exist."  *Kokkonen*, 511 U.S. at 381.
19  Further, where the parties placed the material terms of their settlement agreement on the
20  court record, there is "no need for an evidentiary hearing on whether an agreement
21  existed, or what its terms were," and the court is empowered to summarily enforce the
22  agreement.  *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1139 (9th Cir. 2002).[6]
23  / / /

---

[6] Plaintiff's argues that the Court may not summarily enforce the settlement agreement because material facts concerning a term of the settlement agreement are in dispute.  (ECF No. 89 at 15.)  However, Plaintiff fails to demonstrate a term of the settlement is in fact in dispute.  Thus, summary enforcement is appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### III.    DISCUSSION

It is undisputed Plaintiff breached the Settlement Agreement when it failed to make the one-time payment of $1,150,000 owed to Defendants by June 18, 2015.  As such, Defendants seeks to enforce Article 4.1 of the Settlement Agreement wherein the parties agreed to a "stipulated judgment" against Plaintiff in the amount of $2,000,000 in the event that Plaintiff failed to make the one-time payment of $1,150,000.  (ECF No. 88-1 at 6; ECF No. 88-3 at 7.)  Plaintiff argues that the Court cannot enforce the stipulated judgment amount set forth in Article 4.1 because it constitutes an unlawful penalty clause.

The parties agree that California law applies.  As recently explained by the California Court of Appeal:

> Whether a contractual provision is an unenforceable penalty is determined by the trial court, not the jury.  As a result, the issue has been described as a question of law.  However, the validity of a provision alleged to be an unlawful penalty "is not really a classic question of law, but is one of fact that, because of its character, is nevertheless committed to judicial determination."  Thus, a trial court decides, in light of all the facts, including the whole instrument, whether the provision in question is an unlawful penalty.

*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1354-55 (2015) (citations omitted).

In the context of a non-consumer contract, the current test to assess the validity of a provision alleged to be an unlawful penalty is set forth in California Civil Code § 1671(b) and provides that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."  *See Californians for Population Stabilization v. Hewlett-Packard Co.*, 58 Cal. App. 4th 273, 288 (1997), overruled on other grounds in *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 175-77 (2000).  "This 'new' test

places the burden on the party challenging the liquidated damages provision and

eliminates the requirement to show that fixing actual damages was impracticable or

extremely difficult." *Id.* As explained by the Law Revision Commission Comments:

> In the cases where subdivision (b) applies, the burden of proof on the issue of reasonableness is on the party seeking to invalidate the liquidated damages provision. The subdivision limits the circumstances that may be taken into account in the determination of reasonableness to those in existence "at the time the contract was made." . . . [S]ubdivision (b) gives the parties considerable leeway in determining the damages for breach. All the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract. Other relevant considerations in the determination of whether the amount of liquidated damages is so high or so low as to be unreasonable include . . . the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract.

Law Revis'n Comm'n Comments, 1977 Amendment.

Applying § 1671(b), the amount of a stipulated judgment (arising from a breach of

contract) relative to the missed payment amount is not in itself dispositive of the issue of

whether the stipulated judgment is an unenforceable penalty. There is no *per se* rule with

respect to the reasonableness of any given stipulated judgment amount or as to the

proportionality of the stipulated judgment amount to the debt. Courts have enforced

stipulated judgments that represent a greater percentage of the missed payment amount

than is at issue here. *See, e.g.*, *Burns v. Romero Gen. Constr.*, No. 13-cv-05649, 2015

WL 4498197, at *4 (N.D. Cal. July 23, 2015) (finding enforceable $49,278 of liquidated

damages for a principal amount of $93,415.11 (52.8%)); *Florez v. Yim*, No. B255766,

2015 WL 1524416, at *1 (Cal. Ct. App. Apr. 2, 2015) (enforcing settlement agreement

that provided that, "if respondents did not pay the agreed-upon settlement amount,

appellants could enter a stipulated judgment for $300,000" (71.43% increase))[7]; *Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 656 (1997) (enforcing liquidated damages of twice the actual damages).   Thus, the Court turns to each of Plaintiff's arguments as to why the stipulated judgment amount in this case is unreasonable.

The settlement agreement at issue here is a non-consumer contract.  As such, under the plain language of California Civil Code § 1671(b), Plaintiff ATS bears the burden of proof to demonstrate that the stipulated judgment provision of its settlement agreement with Defendants is unenforceable because it reflects an amount of liquidated damages that is so high as to be "unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. Code § 1671(b).  To meet its burden of proof, Plaintiff points to (1) the absence of actual damages resulting from Plaintiff's failure to make the one-time payment (ECF No. 89-1, ¶13), (2) the fact that Defendants never advised Plaintiff ATS that the $2,000,000 stipulated judgment amount reflected their "reasonable attempt to determine the actual amount of 'time value of money' damages that might arise should ATS not timely make the $1,150,000.00 Settlement Payment" (*id.*, ¶10), and (3) the fact that the stipulated judgment provision increases the debt owed by Plaintiff by $850,000 if ATS makes the settlement payment even one day late.

First, Plaintiff's focus on the absence of evidence showing Defendants' ***actual*** damages resulting from Plaintiff's failure to make the one-time payment is misplaced.  Under section 1671(b) and consistent case authority, a liquidated damages provision may be unreasonable, and hence unenforceable, if the party seeking to invalidate the provision establishes the amount of liquidated damages "bears no reasonable relationship to the range of actual damages that the parties ***could have*** anticipated would flow from a breach.'" *Jade Fashion & Co. v. Harkham Indus., Inc.*, 229 Cal. App. 4th 635, 646 (2014) (quoting *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998)

---

[7] Although unpublished, *Florez v. Yim* still is an example of California law on this issue.

(emphasis added)); *Greentree Fin. Grp., Inc. v. Execute Sports, Inc.*, 163 Cal. App. 4th 495, 497 (2008).  Thus, "the validity of the liquidated damages provision depends upon its reasonableness at the time the contract was made and not as it appears in retrospect. Accordingly, 'the amount of damages ***actually suffered has no bearing*** on the validity of the liquidated damages provision.'"  *Edwards v. Symbolic Int'l, Inc.*, No. 07cv1826-JMA, 2009 WL 1178662, at *5 (S.D. Cal. Apr. 30, 2009) (emphasis in original).

Second, the Court is not persuaded by Plaintiff's evidence that Defendants never advised Plaintiff that the $2,000,000 stipulated judgment amount reflected their "reasonable attempt to determine the actual amount of 'time value of money' damages that might arise should ATS not timely make the $1,150,000.00 Settlement Payment." (ECF No. 89-1, ¶10.)  "No actual negotiation regarding the amount of the liquidated damages need take place."  *Edwards*, 2009 WL 1178662, at *6.  Instead, treatises and courts analyzing whether liquidated damages reflect the range of harm that reasonably could be anticipated at the time the parties contracted focus more on the reasonableness of "the amount of liquidated damages, and not the process by which that amount was derived."  *Util. Consumers' Action Network, Inc. v. AT&T Broadband of S. Cal., Inc.*, 135 Cal. App. 4th 1023, 1034 (2006).

Further, the process by which the parties determined the stipulated damages provision supports, rather than undermines, a conclusion that the amount is reasonable under the circumstances existing at the time the contract was made.[8]  Plaintiff's bargaining power in negotiating and signing the settlement agreement was at least equal to that of Defendants.  Plaintiff was represented at the settlement conference by

---

[8] *See* Law Revis'n Comm'n Comments, 1977 Amendment ("Other relevant considerations . . . include . . . the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract").

sophisticated counsel of its choice.[9]  The settlement agreement was not a form contract; rather, it was specifically negotiated by the parties' principals and their attorneys in the context of a full-day ENE that was presided over by a neutral magistrate judge.[10]  (ECF No. 72.)  The stipulated judgment amount was one of the material terms of the settlement that the parties put on the record at the conclusion of the ENE and included in the written Settlement Agreement months later.  (ECF Nos. 79, 80, 88-1 at 3; ECF No. 88-2 at 2 (L. Sutton Decl.).)  Thus, in light of the circumstances at the time of contracting, the Court attaches little significance to Plaintiff's evidence that Defendants did not convey to Plaintiff their calculation of the relationship between the stipulated judgment amount and the amount Defendants could anticipate would flow from Plaintiff's breach of the Settlement Agreement.

Third and finally, the fact that the stipulated judgment provision increases the debt owed by Plaintiff by $850,000 if ATS makes the settlement payment even one day late is not dispositive here.  Plaintiff argues the $850,000 "bears no 'proportional relation' to any conceivable damages that could possibly be caused by the failure to make the $1,150,000.00 Settlement Payment on time."  (ECF No. 89 at 5-6, 8-14.)  Again, the Court is unpersuaded.

Plaintiff's argument improperly attempts to shift the evidentiary burden onto Defendants and relies on the incorrect premise that its obligation to Defendants is "simply the payment of money," such that "interest on the past due amount" constitutes

---

[9] Plaintiff's counsel, Richard Blaylock, specializes in intellectual property litigation and corporate transactional counseling.  (ECF No. 90-3, Ex. B at 1.)  Mr. Blaylock also works at Pillsbury, a "full-service law firm" with "multidisciplinary teams" trained to understand its clients' objectives and "bring a 360-degre perspective to complex business and legal issues."  (ECF No. 90-2, Ex. A at 2.)  Pillsbury's website states that its litigators have received "top-tier, national recognition from various ranking agencies, including Chambers USA and US News & World Report."  (*Id.*)  Plaintiff's counsel had the skill, experience, and legal support necessary to advise Plaintiff as to whether the stipulated judgment provision was reasonable under the circumstances existing at the time the settlement was made.
[10] Prior to the ENE, the parties also participated in private mediation before a JAMS mediator in San Diego.  (ECF No. 1-2 at ¶34.)

the full extent of the harm that reasonably could have been anticipated at the time of the making of the Settlement Agreement.  (*See* ECF No. 89 at 11.)  Having presided over the settlement negotiations, the Court disagrees.  This case is distinguishable from the cases cited by Plaintiff, such as *Greentree* where the parties "simply selected the amount Greentree had claimed as damages in the underlying lawsuit, plus prejudgment interest, attorney fees, and costs."  *Greentree*, 163 Cal. App. 4th at 497.

Here, the record supports the conclusion that the parties reasonably could have anticipated at the time of contracting that proof of Defendants' actual damages from Plaintiff's breach of the Settlement Agreement would be costly or inconvenient, and that proof of Plaintiff's actions or omissions causing foreseeable damages to Defendants would be difficult to show.  The settlement negotiated by the parties was complex and assessing potential damages from Plaintiff's breach would have been difficult.  This is especially true considering the parties' roles in the DLA and FDA approval process, the uncertainty and expense of the FDA approval process, the prosecution and maintenance of any patent rights with respect to product SP-SAP, and the absence of settlement terms requiring Plaintiff to demonstrate to Defendants its good faith efforts to generate revenue in connection with SP-SAP.  Defendants could have anticipated at the time of contracting that Plaintiff's failure to make the one-time payment would signal a significant change in Plaintiff's likelihood of ultimately achieving revenue from SP-SAP.

The difference between the stipulated judgment amount and the one-time payment is $850,000.  (ECF No. 88-3, Ex. A at 7.)  Plaintiff asserts that the entire $850,000 difference constitutes a "penalty."  (ECF No. 89 at 9.)  Plaintiff's assertion is unpersuasive because it fails to recognize the underlying complexities of the settlement agreement and the interplay between the stipulated judgment and the revenue sharing obligation.  In the instant case, the amount of liquidated damages is mitigated by the term in the Settlement Agreement which provides that, of the $2,000,000 collected as part of the stipulated judgment, Plaintiff can offset $700,000 from the first $700,000 in revenue

sharing payments due to Defendants under the Settlement Agreement.  (ECF No. 88-3 at 7 (Article 4.2).)  Thus, this mitigating provision anticipates approximately $150,000 to be the net amount that Plaintiff would lose by virtue of its breach of the one-time payment provision, assuming diligent and successful efforts in the monetization of the patents at issue.  Plaintiff does not argue this amount to be unreasonable.

In the absence of a showing to the contrary by the party bearing the burden of proof, section 1671(b) directs courts to presume a reasonable relationship between a liquidated damages provision and the circumstances existing at the time the contract was made.  Here, Defendants and their attorneys could have anticipated at the time of contracting that substantial attorney time, and therefore fees, would be necessary to try to recover a judgment and settlement funds from Plaintiff if it breached its payment obligation.  Defendants could have also considered that substantial loss-of-patent-life and lost future profit damages would continue to grow as they pursued a judgment and settlement funds from Plaintiff.  Indeed, Defendants have now been seeking settlement funds from Plaintiff for over eight months.

In sum, the Court concludes that Plaintiff fails to present sufficient evidence to meet its burden to show the stipulated judgment provision was unreasonable under the circumstances existing at the time the contract was made.  Therefore, the Court concludes that the Stipulated Judgment Provision within the Settlement Agreement is reasonable and enforceable.[11]

---

[11] Plaintiff had multiple opportunities during the settlement negotiation to raise concerns regarding the stipulated judgment amount.  Instead, Plaintiff chose to raise this issue for the first time after it breached the Settlement Agreement and after it became "apparent that [Plaintiff] would not be able to make the full $1,150,000 Settlement Payment on or before June 18, 2015."  (ECF No. 89-1, Higgins Decl. at 3.)  Plaintiff fails to meet its burden of proof, and thus, the Court declines to alter the Parties' signed agreement simply because Plaintiff has become dissatisfied with the agreement.  *See DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 725 (2009) ("The court may not remake the bargain to the advantage of one party for no reason other than that the party has become dissatisfied with the agreement.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### III. CONCLUSION

Defendants' Motion to Enforce the Parties' Settlement Agreement and Stipulation for Judgment (ECF No. 88) is hereby **GRANTED**.

The Clerk of Court is instructed to please enter the parties' stipulated **JUDGMENT** in favor of Defendants and against Plaintiff in the amount of $2,000,000.00.

This case is closed.

**IT IS SO ORDERED.**

Dated:  March 7, 2016

Hon. Jill L. Burkhardt
United States Magistrate Judge

13